

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| GERALD IACONO, | No. CV 17-8083-FMO (PLAx) |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO COMPEL** |
| v. | |
| INTERNATIONAL BUSINESS MACHINES CORP., <u>et al.</u>, | |
| Defendants. | |

**I.**

**BACKGROUND**

On August 29, 2018, the parties filed a Joint Stipulation (alternatively "JS"), along with supporting declarations and exhibits, regarding plaintiff Iacono's ("Iacono" or "plaintiff") Motion to Compel ("Motion" or "Mot.") defendant International Business Machines Corporation ("IBM" or "defendant") to provide further responses to plaintiff's Request for Production of Documents (Set Five) ("RFP"), numbers 106, 109, 111, 113, 115-17, 119, 121-23, 125-43, and Interrogatories (Set Three), numbers 19-21.  (ECF No. 65).  On September 5, 2018, defendant filed the Supplemental Declaration of Momo E. Takahashi ("Takahashi Supp'l Decl.").  (ECF No. 72).  On September 14, 2018, plaintiff filed his Supplemental Memorandum (alternatively "Pl.'s Supp'l Mem.").  (ECF Nos. 75, 76).

1    On May 15, 2018, plaintiff served the subject RFPs and Interrogatories on defendant.

2    (Dean Decl. ¶ 2).  On June 14, 2018, defendant served its responses to the discovery.  (Id. ¶ 3).

3    On July 3, 2018, in a letter to defendant's counsel Momo Takahashi ("Takahashi"), plaintiff's

4    counsel, Lauren A. Dean ("Dean"), initiated a meet and confer process regarding defendant's

5    "deficient responses."  (Id. ¶ 4, Ex. 1).  On July 13, 2018, counsel for the parties engaged in a

6    telephonic meet and confer regarding the disputed RFPs and Interrogatories, and "reached an

7    impasse on most issues." (Id. ¶ 5).  Due to a second settlement conference scheduled on August

8    1, 2018, the parties agreed to defer the issues raised in the June 3, 2018, letter.  (Id. ¶ 6).  On

9    August 13, 2018, Dean sent an email to Takahashi confirming her understanding of the issues on

10   which defendant had agreed it might provide a further response, and confirming that an impasse

11   had been reached as to all other issues.  (Id. ¶ 7, Ex. 2).  Plaintiff determined that Takahashi's

12   response to the August 13, 2018, email did not resolve the discovery issues raised in the meet and

13   confer letter.  (Id.).  Because of the impending September 21, 2018, discovery cut-off, plaintiff

14   states that he had to file the JS no later than August 22, 2018.[1]  (Id. ¶ 8).

15   By way of background, pursuant to an IBM "resource action" or "reduction in force" with the

16   code name "Solitaire," plaintiff alleges that on August 17, 2016, he was wrongfully released from

17   his employment as a Sales Specialist, at the age of 57, after 34 years of service.  (JS at 1).

18   Plaintiff states that at the time he was "wrongfully selected" for the reduction in force, he "was

19   exceeding his quota and had recently received a high performance rating of 2+." (Id.).  He states

20   that "IBM has been conducting Resource Actions, including a 2013 Resource Action resulting in

21   a class action age discrimination lawsuit," and that it "simply stopped providing age related data

22

23   [1]   The District Judge's Scheduling Order provides that the discovery cut-off "is the date by
     which all discovery, **including all hearings on any related motions**, is to be completed."  (ECF
24   No. 11, ¶ II.B (emphasis in original)).  It further provides that "[a]ny motion relating to a deposition
     or challenging the adequacy of discovery responses must be filed, served, and calendared
25   sufficiently in advance of the discovery cut-off date to permit the responses to be obtained and the
     deposition to be completed before the discovery cut-off if the motion is granted.  Given the
26   requirements set forth in the Local Rules (e.g., "meet and confer" and preparation of the Joint
     Stipulation), any party seeking to file a discovery motion must usually initiate meet and confer
27   discussions at least seven (7) weeks before the discovery cut-off, i.e., by preparing and serving
     the letter required by Local Rule 37-1."  (ECF No. 11, ¶ II.C).
28

pursuant to the Older Workers' Benefits Protections Act." (JS at 2).  He asserts in the Motion that in early 2016, IBM directed another resource action with the code name "Saturn," and that IBM refuses to disclose anything about Saturn including the impact that resource action had on older workers.  (Id.).  He "suspects that combining the results of Saturn and Solitaire would show a disparate impact on older workers."  (Id.).  He further notes that "IBM Managers reverse engineered their staff reduction worksheets by first selecting the employees they wished to terminate then created ratings and rankings purporting to justify their selection decisions." (JS at 4).

Defendant responds that despite eight months of written discovery, including a total of 156 requests for production, over 6,300 pages of documents produced, and five depositions, "Plaintiff cannot point to a single piece of evidence indicating any discriminatory animus against him (or more broadly, older workers) by anyone who contributed to the decision to select Plaintiff for layoff in the Solitaire Resource Action."  (Id.).  Defendant contends that plaintiff is attempting "to build his case by stringing together dated, irrelevant publications remotely touching on age to claim IBM has a corporate 'youth culture.'" (Id.).  It states that there was a statistically insignificant difference in the average age of the Enterprise business organization ("EBU") before and after the Solitaire resource action.  (Id.).  It also states that "within Plaintiff's own division, there is evidence that an older worker (age 59) who was initially marked for layoff, was switched out and replaced by a younger worker (age 53) for layoff."  (Id.).  It denies that its managers reverse engineered the selection process and states that "the decision makers made a legitimate business decision that Plaintiff's accounts were moving to another region, leaving Plaintiff with no accounts." (JS at 5).  Defendant notes that some of the discovery at issue here focuses on two IBM publications that plaintiff claims are "critical of older workers" while "tout[ing] the positive characteristics of younger workers," "as a basis to fish for *any and all* documents that in any way discuss age."  (Id. at 5 (internal quotation marks omitted)).  It asserts that there is a "glaring problem with Plaintiff's reliance" on the two publications at issue: "*Myths, exaggerations and uncomfortable truths – The real story behind Millennials in the workplace*" ("Myths Article") and "*The Maturing Workforce,*

*Innovation in Workplace Enablement*" ("Maturing Workforce Article"), as these articles are not actually critical of older workers. (Id.). Additionally, "none of the decision makers in this case ha[s] ever heard of these two documents," or any other article pointed to by plaintiff. (JS at 6). IBM states that although plaintiff now "disingenuously claims he recently learned of [the Saturn] Resource Action that occurred close in time to the Solitaire Resource Action," he "was aware of the existence of other Resource Actions (which likely prompted Plaintiff's overbroad discovery in the first instance)," and "should not now be allowed to abuse federal discovery in furtherance of his unsubstantiated crusade against IBM." (Id.). It also submits that plaintiff has failed to demonstrate that the requested discovery is relevant and proportional to the needs of the case, and states that the discovery is irrelevant and overbroad, as it is unrelated to the decision to select plaintiff for layoff in the Solitaire resource action. (JS at 6-7).

Having considered the arguments submitted in connection with the Motion, the Court has concluded that oral argument will not be of material assistance in determining the Motion. Accordingly, the hearing scheduled for September 19, 2018, is **ordered off calendar**. (See Local Rule 7-15).

## II.

## **DISCUSSION**

As it did when addressing plaintiff's previous motions to compel (ECF Nos. 21, 66), the Court will examine the issues in this Motion using the general standards set forth in Rules 1 and 26 of the Federal Rules of Civil Procedure.

/

/

/

/

/

**A.    DISCOVERY REMAINING IN DISPUTE**

Defendant states that on August 30, 2018, it served supplemental responses to RFP numbers 109, 115, and 119.  (Takahashi Supp'l Decl. ¶ 3).  In his Supplemental Memorandum, plaintiff contends that defendant's supplemental responses to RFP numbers 109, 115, and 119, were insufficient.  (Pl.'s Supp'l Mem. at 1-2, 4).  Accordingly, all of the disputed discovery discussed in the Joint Stipulation remains at issue.

Defendant suggests that there are three categories of requests at issue here:  (1) requests such as RFP numbers 109, 115, and 119, seeking evidence of discriminatory animus or failure to follow resource action protocols/training by the relevant decision makers ("Animus Requests"); (2) requests such as RFP numbers 106 and 111, and Interrogatory number 21, seeking information about resource actions other than the Solitaire resource action that affected plaintiff ("Other Resource Action Requests")[2]; and (3) requests such as RFP numbers 117, 121-23 and 125-43, and Interrogatory numbers 19 and 20, that seek articles, conference materials, or recruitment documents "that in any way touch on age," e.g., refer to "Millennials, Generation X, Baby Boomers" ("Article Requests").  Defendant states that it "made a good faith effort to suggest reasonable limitations in responding to the Animus Requests, but that the other two categories "seek irrelevant information about other Resource Actions that had nothing to do with Plaintiff, and irrelevant, grossly overbroad 'corporate culture' or 'youth culture' Requests (often with absolutely no date limitation)."  (JS at 7).  It argues that any purported relevance "is far outweighed by the burden to IBM and is not proportional to the needs of this case."  (Id.).

**B.    ANALYSIS**

**1.    Animus Requests and Other Resource Action Requests**

Plaintiff states that "[l]ate into the discovery process" he learned that the Saturn resource action took place in 2016 just prior to the Solitaire resource action that affected him.  (JS at 9).

---

[2]    Because the Animus Requests and the Other Resource Action Requests substantially overlap, for purposes of this Order the Court will consider them together.

In each of the subject requests, therefore, he asked for documents related to the Saturn resource action and/or documents related to *any* resource action.  (See RFP numbers 106, 109, 111, 115, and 119; Interrogatory number 21),

RFP number 106 asked for documents "showing the IBM business units and positions affected by the Resource Action titled Saturn."  (JS at 8).  RFP number 111 asked for "a computer compilation identifying the age, position, band and salary at time of the Resource Action, as well as the date of hire and date of termination," for any employee identified in "any Resource Action involving Matt Marriott as a decisionmaker [sic] and/or participant in the decision-making process," and  Interrogatory number 21 similarly asked IBM to identify "[f]or *any* Resource Action involving Matt Marriott as a decisionmaker [sic] . . . , for each employee selected for a Resource Action, . . . the code name of the Resource Action, the age, position, band and salary of the employee at time of the Resource Action, as well as the date of hire and date of termination of the employee."  (JS at 77 (emphasis added)).

RFP numbers 109 and 115 asked for calendar entries reflecting the date various resource action decision makers (Ficklen, Legan, Giani, Marriott, Briley, and/or Orchard), received training for *any* resource action that took place in 2016, including Solitaire and Saturn.  (JS at 14, 24).  With respect to Marriott, RFP number 109 was not limited as to time or resource action.  (JS at 16).  As a compromise, with respect to RFP number 109, IBM agreed to search again for any documents confirming Marriott's attendance at training for the Solitaire resource action that reflect the dates he attended.  (JS at 16-17 (citing Takahashi Decl. ¶ 10, Ex. F)).  Similarly, with respect to RFP number 115, IBM agreed to review its records again for any additional calendar entries identifying "Solitaire" that it has not already produced.  (JS at 27-28).  Request number 119 asked for all "[p]erformance evaluations, job reviews, write-ups, complaints, comments, criticisms or warnings" concerning these same six employees, "during their employment" with IBM.  (JS at 37).  With respect to RFP number 119, IBM agreed to review its records again to produce any responsive documents to the extent that there are any that relate to age or age discrimination.  (JS at 39).

6

With respect to RFP number 109, plaintiff argues that Marriott's training regarding IBM's reduction in force process is "directly relevant and a critical piece of information because IBM claims he is the sole decisionmaker [sic] responsible for selecting [plaintiff] for the reduction in force." (Id.). IBM responds that Marriott testified that he has "been involved in approximately 10 to 15 different Resource Actions and participated in over 10 sessions of Resource Action training related to his participation." (JS at 16 (citing Takahashi Decl. Ex. C)). It states that there are no records kept of training attendance related to particular resource actions, and "no straightforward way of determining . . . the 10+ Resource Actions that . . . Marriott participated in training for, so as to identify and produce those documents that reflect the date he received training." (JS at 16). Plaintiff states that "IBM likely can obtain evidence of calendar invitations to Marriott to participate in training," and argues that IBM's compromise limiting its production to the Solitaire resource action is insufficient as the "amount and sufficiency of [his] training is directly relevant to issues of pretext . . . ." (Pl.'s Supp'l Mem. at 1). With respect to RFP number 115, plaintiff also contends that the supplemental production should not have been limited only to the Solitaire resource action as plaintiff "seeks to know if the decisionmakers [sic] at issue received training in connection with Saturn as evidence of the extent of their training or lack thereof." (Pl.'s Supp'l Mem. at 1-2).

Plaintiff generally submits with respect to all of these requests and as to Interrogatory number 21, that because the Saturn and Solitaire resource actions took place in 2016, he "suspects" that the impact they *collectively* had on older workers would reveal a disparate impact on older workers and, therefore, is relevant. (JS at 2, 9). He argues that with "more data regarding the numbers of older workers selected for termination versus younger workers, [he] will be able to identify whether a statistically significant disparity exists." (Id.). He further argues that statistical evidence is "unquestionably relevant and discoverable in a disparate treatment case." (Id. (citation omitted)). Plaintiff further contends that defendant's supplemental production should not have been limited only to the Solitaire resource action as plaintiff "seeks to know if the decisionmakers [sic] at issue received training in connection with Saturn as evidence of the extent of their training or lack thereof." (Pl.'s Supp'l Mem. at 1-2).

1      With respect to plaintiff's first motion to compel (ECF No. 15), on April 16, 2018, the Court

2   determined that "to the extent that plaintiff requests all documents relating to the decision 'to do

3   a layoff/Resource Action in 2016' *other than* the 2016 action that affected plaintiff," his discovery

4   requests were overbroad.  (ECF No. 21 at 8).  The Court, however, expanded defendant's

5   production "to the nationwide EBU and the 2016 resource action that affected plaintiff." (Id. at 12).

6   The Court also ordered defendant to produce "the underlying statistical data regarding the

7   individuals chosen for layoffs in the EBU (nationwide) pursuant to the 2016 resource action that

8   affected plaintiff." (ECF No. 21 at 14, 17-18).  Then, on August 30, 2018, with respect to plaintiff's

9   second motion to compel (ECF No. 62), the Court further clarified that defendant's production of

10  certain documents must include documents relating to Solitaire for the entire 2016 calendar year,

11  including "for the nationwide sales organization that emerged as a result of [the] reorganization"

12  of the EBU in mid-2016.  (ECF No. 66 at 5-6 (regarding RFP number 93 (Set Three) and

13  Interrogatory numbers 12, 17 and 17 (Set Two)).  Plaintiff provides the Court with no reason to

14  expand the scope of discovery to other resource actions now.  Indeed, other than his speculation

15  that the collective effect of Saturn and Solitaire would show a disparate impact (where, according

16  to defendant, the statistical evidence of Solitaire alone did not show a significant impact -- an

17  assertion that plaintiff does not dispute), plaintiff has presented the Court with no information that

18  examination of any other resource action would shed any light on the reasons that *he* was

19  selected for termination pursuant to the Solitaire resource action.  While statistical data showing

20  an employer's pattern of conduct toward a protected class can *create an inference* that an

21  employer discriminated against individual members (JS at 9 (citing Diaz v. Am. Tel. & Tel., 752

22  F.2d 1356, 1362-63 (9th Cir. 1985) (finding that it was error to grant summary judgment where

23  plaintiff had been *unable* to discover statistical evidence relevant to individual discrimination

24  claims))), that is not the case with respect to individual discrimination in this individual employment

25  discrimination case, in which plaintiff alleges that age discrimination was involved in the Solitaire

26  resource action that led to his termination.  (JS at 12 & n.2 (citing Cooper v. Fed. Res. Bank of

27  Richmond, 467 U.S. 867, 876, 104 S. Ct. 2794, 81 L. Ed. 2d 718 (1984) (noting that the "crucial

28

difference between an individual's claim of discrimination and a class action alleging a pattern or practice of discrimination is manifest.  The inquiry regarding an individual's claim is the reason for a particular employment decision, while 'at the liability stage of a pattern-or-practice trial [in a class action] the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decisionmaking'") (citation omitted))).

"Statistical data is relevant [in a Title VII disparate treatment case based on sex, race, color, national origin, and religion] because it can be used to establish a general discriminatory pattern in an employer's hiring or promotion practices.  Such a discriminatory pattern is probative of motive and can therefore create an inference of discriminatory intent with respect to the individual employment decision at issue."  See Diaz, 752 F.2d at 1363.  In this age discrimination case brought under California's Fair Employment and Housing Act ("FEHA"), plaintiff has asked for, and defendant has already been ordered to provide, *nationwide* age-related statistical data *relating to the Solitaire resource action that affected plaintiff*.  (See JS at 46-47 (citing Takahashi Decl. ¶ 14)); Coleman v. Quaker Oats Co., 232 F.3d 1271, 1281 (9th Cir. 2000) (in a case brought pursuant to FEHA alleging age discrimination based on the manner of plaintiff's discharge, to make out a prima facie case of age-based disparate treatment in cases involving a general reduction in workforce a plaintiff may show through circumstantial, statistical, or direct evidence that the discharge occurred under circumstances giving rise to an inference of age discrimination).  Such evidence with respect to the Saturn (or any other) resource action is not relevant or proportional to the needs of this individual age discrimination case.  See Hawn v. Exec. Jet Mgmt., Inc., 615 F.3d 1151, 1156 (9th Cir. 2010) ("a plaintiff may show 'an inference of discrimination in whatever manner is appropriate in the particular circumstances,'" including "through comparison to similarly situated individuals, or any other circumstances *'surrounding the adverse employment action* [that] give rise to an inference of discrimination'") (emphasis added) (brackets in original) (citing Diaz, 752 F.2d at 1361, Peterson v. Hewlett-Packard Co., 358 F.3d 599, 602-03 (9th Cir. 2004)); see Ardrey v. United Parcel Service, 798 F.2d 679, 684-85 (4th Cir. 1986) (the "discovery allowed as to [plaintiffs'] individual claims was sufficient to develop evidence, statistical and otherwise, relating

to whether discrimination was the 'standard operating procedure' of UPS *in regard to their positions*, or concerning promotions, transfers, suspensions or discipline, *related to their individual claims*") (emphases added).

Based on the foregoing, plaintiff's Motion with respect to RFP number 106, which asked for documents related only to the Saturn Resource action, is **denied**.  Plaintiff's Motion with respect to RFP numbers 109, 111, 115, and 119, and Interrogatory number 21, is **granted in part**.  To the extent it has not already done so, **no later than October 1, 2018**, for calendar year 2016, and only with respect to the Solitaire resource action that affected plaintiff -- including "the nationwide sales organization that emerged as a result of [the] reorganization" of the EBU in mid-2016 -- defendant shall provide a further response to Interrogatory number 21, and produce documents responsive to RFP numbers 109, 111, and 115 with respect to the nationwide EBU.  With respect to Request number 119, to the extent it has not already done so in accordance with its proposed compromise agreement, **no later than October 1, 2018**, IBM shall produce any "[p]erformance evaluations, job reviews, write-ups, complaints, comments, criticisms or warnings" concerning Ficklen, Legan, Giani, Marriott, Briley, and/or Orchard, to the extent that there are any such documents that relate to age or age discrimination.  In all other respects, plaintiff's Motion with respect to RFP numbers 109, 111, and 115, and Interrogatory number 21 is **denied**.

## 2.   Article Requests:  RFP Numbers 117, 121-23, 125-43; Interrogatory Numbers 19 and 20

RFP Numbers 117, 121-23, and 125-43 seek documents related to the following:  (a) presentations made at various conferences (RFP Nos. 121, 127), or reflecting certain terms or ideas, such as "Early Professional hires," "seniority mix," "reprofiling current talent," "Generation Y," "digital natives," "talent refresh," or campus recruiting programs (RFP Nos. 117, 122, 128, 130, 131); (b) articles such as the Myths Article, and the Maturing Workforce Article, among others (RFP Nos. 125, 126); (c) studies or research relating to millennials, or to changing the age demographic of IBM's workforce, or to an interactive survey titled "How Millennial Are You?" (RFP Nos. 129, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142); or (d) how IBM chose the

individuals who appeared in a 4-page advertisement in the May 22, 2017, New York Times (RFP No. 143).  Interrogatory numbers 19 and 20 similarly seek information regarding "all actions" taken by IBM "to recruit, attract, engage and/or retain Millennials since January 1, 2012" (JS at 75), and "all research, studies, investigations, examinations, analyses, surveys, audits or reviews IBM or its agent has conducted or adopted that reference, discuss or relate to age, age demographics, applicant or employee generations, Millennials, Generation X, Baby Boomers, the actual or perceived traits of any age generation, or the age demographics of IBM's actual or desired workforce."  (JS at 76).

Plaintiff generally argues that discovery similar to that he seeks here -- relating to "IBM's youth-based employment branding and corporate culture" -- "has been held relevant and discoverable in countless cases."  (JS at 41 (citing cases from other circuits)).  He asserts that IBM's generalized assertions of undue burden, expense, and lack of proportionality "ring hollow," and are inadequate.  (JS at 42).  He states that his "complaint of intentional discrimination, including *IBM's pattern and practice of utilizing layoffs to target older workers for termination*, serves an important social and legal function."  (Id. (citations omitted) (emphasis in original)).  He further states that IBM alone has access to the requested information and, therefore, "the burden of responding to discovery lies heavier on the party who has more information . . . ."  (JS at 43 (citation omitted)).  He concludes that the information sought is "plainly relevant to the issue of IBM's cumulative managerial attitudes toward older workers and younger workers."  (Id.).

Defendant responds that because plaintiff lacks "any evidence to support his age discrimination claim," he continues "to seek 'pattern and practice' evidence that is improper in his single-plaintiff discrimination case."  (JS at 43-44).  Defendant notes that plaintiff is relying on anonymous social media posts and publications by IBM that fail to actually support his theory that IBM is critical of older workers and favors younger workers.  (JS at 44-45).  Additionally, defendant states, there is no link between these presentations and articles, and the decision to select plaintiff for layoff.  (JS at 45 (citing deposition testimony)).  Defendant distinguishes plaintiff's out of circuit cases on the grounds that they involved situations in which there was (a) clear statistical evidence

of a "campaign to present a more youthful image" and, therefore, there was direct evidence of ageism; or (b) evidence directly linking promotions to the age of the employee; or (c) direct statements that the company had a plan to hire young managers and evidence that current managers were told that "some of you people that have been in these positions forever . . . need to start looking around for things outside the department, and maybe even outside the company, so that we can make room for these younger people to grow." (JS at 45-46 (citations omitted) (internal quotation marks omitted)). Defendant asserts that the statistical evidence it has produced in this case shows a "statistically insignificant difference in the average age of workers in the EBU before and after the Resource Action and there is no evidence of any age related statements reflecting animus by anyone at IBM." (JS at 46-47). Defendant further states that plaintiff's requests are "grossly overbroad, [and] vague and ambiguous," as plaintiff fails to identify the documents he is quoting from and/or fails to provide a date for the alleged conferences or presentations, which "makes it near impossible for IBM to know where to begin to look for the documents described." (JS at 49, 53). It also asserts that there "is not [a] feasible, cost effective manner" to determine which individuals, among the "hundreds of custodians" that might fit plaintiff's descriptions of "managers with hiring/firing authority," and "Human Resources professionals," might have responsive documents. (JS at 58). Additionally, to the extent that some of these requests seek documents relating to the issue of "backfilling" -- a practice of replacing the terminated individuals in order to "refresh talent" -- defendant contends backfilling was prohibited with respect to those individuals in the Solitaire resource action, such as plaintiff, who were sellers, such that they could not be replaced for at least ninety days. (JS at 12-13, 53, 58). It concludes, therefore, that all of these requests are seeking information irrelevant to the decision to lay off plaintiff. (Id.). Defendant generally submits that plaintiff's "fishing expedition puts an undue burden on IBM to determine custodians and divisions to approach in a reasonable good faith effort to search for responsive documents with little to lead the search." (Id.). The burden is compounded by the fact that plaintiff is seeking "irrelevant documents that are

1  completely untethered to the decision to terminate Plaintiff's employment and creates an undue

2  burden on IBM that is disproportionate to the needs of this case." (Id.).

3       After reviewing the subject requests and the arguments of the parties, the Court agrees that

4  these requests are overly broad, vague and ambiguous.  Additionally, even if the information

5  sought is -- at best -- marginally relevant to plaintiff's allegations (which the Court does not

6  determine), the burden on defendant to search for the proverbial needle in the haystack is not

7  proportional to the needs of this case.  However, as the Court determined with respect to plaintiff's

8  second motion to compel, "documents relating to IBM's underlying reasons that may have led to

9  the 2016 nationwide EBU resource action that affected plaintiff and others are relevant to plaintiff's

10  claim of age discrimination.  The fact that a specific manager identified plaintiff for layoff does not

11  render irrelevant information, if any exists, that the company may have given direction to its

12  managers as to the criteria . . . that those managers might consider in making that decision,

13  whether as to this specific employment action or such actions in general. . . . Notwithstanding the

14  foregoing, the Court believes that a search tailored to a few select potential custodians of

15  responsive documents would not be disproportionately burdensome." (ECF No. 66 at 8-9).  The

16  same holds true here with respect to RFP numbers 117, 121-23, and 125-43.  Plaintiff suggests

17  that such information might reasonably be found in the records of Marriott, Stephen A. Leonard,

18  Tamra Briley, and Paul Giani.  (Pl.'s Supp'l Mem. at 3-4).

19       Based on the foregoing, plaintiff's Motion to compel a further response to Interrogatory

20  numbers 19 and 20 is **denied**.  Plaintiff's Motion to compel a further response and/or documents

21  to RFP numbers 117, 121-23, and 125-43, is **granted in part**.  **No later than October 1, 2018**,

22  if it has not done so already, defendant shall conduct a diligent search (including an ESI search)

23  for responsive documents from January 1, 2012, through December 31, 2016, in the possession,

24  custody, or control of the following individuals:  Matthew Marriott, Stephen A. Leonard, Tamra

25  Briley, and Paul Giani.

26  /

27  /

28

13

### 3. RFP Number 113

RFP number 113 asked for all documents "evidencing the hiring of sales representatives after Solitaire, including age, position, band, salary and date of hire." (JS at 22 (citing to Briley 4/12/16 email stating that "'we do plan to backfill but more than likely into non exec, individual contributor roles.'")).  Defendant responded that the request is overbroad as to time, scope and geographic region, is vague and ambiguous as to the term "evidencing," assumes facts not in evidence, is irrelevant to any party's claims or defense, is not proportional to the needs of the case, violates privacy rights, and is protected as confidential by the attorney-client privilege and/or work product doctrine.  (JS at 22).  Plaintiff contends that the "individuals hired after the termination of older workers is directly relevant to the issues in this case and [to plaintiff's] contention that IBM was and is involved in a campaign to change the face of IBM by eliminating older workers and replacing them with Millennials." (JS at 23).  Defendant responds that the email quoted from related to a "completely different headcount reduction target which impacted a different population of managers and executives -- [and] Plaintiff was a seller whose position could not be backfilled." (JS at 23-24).  It suggests that the request is overbroad as it seeks information related to any hiring of sales representatives after Solitaire, which goes beyond the EBU, which reorganized in July 2016.  (JS at 24).  Additionally, because the EBU "ceased to exist in the same structure as when Plaintiff was selected for the Solitaire Resource Action," "IBM does not have a way to determine who was hired within the EBU after July 1, 2016." (JS at 24).  Plaintiff responds that because the Court previously compelled defendant to provide information in connection with RFP number 93 (Set Three), defendant should be compelled to answer RFP number 119.  (Pl.'s Supp'l Mem. at 2).

The Court agrees -- to a limited extent -- with plaintiff.  Plaintiff's Motion with respect to RFP number 113 is **granted in part**.  To the extent it has not already done so with respect to RFP number 93 (set Three) (see ECF No. 66 at 5-6), **no later than October 1, 2018**, defendant shall provide documents reflecting new hire data for sales representatives hired in the nationwide EBU between April 1, 2016, and the end of 2016, including for the "nationwide sales organization that

emerged as a result of [the EBU's] reorganization."  (Id.).  In all other respects, plaintiff's Motion with respect to RFP number 113 is **denied**.

### 4.      RFP Number 116

RFP number 116 asked for documents relating to the reasons "for excluding Early Professional hires (employees who have been hired [from] the university campus within nine months from the identification period . . . and/or Summit Hires from Resource Actions."  (JS at 28 (citation omitted)).   In its response, IBM stated that it had already "produced non-privileged responsive documents responsive to ths request," and that it "will not produce . . . privileged documents," but to the extent responsive privileged documents exist, it will identify such documents on a privilege log.  (Id.).

Plaintiff contends that IBM should be required to produce documents "explaining why its younger employees are exempted from a Staff Reduction as such evidence would be probative of IBM's effort to transition its workforce to a younger workforce at the expense of its older workers." (JS at 29).  He also seems to imply that defendant never produced a privilege log with respect to this request.  (JS at 30).

Defendant states that early professional hires "are not excluded from Resource Actions entirely," but are only excluded when a manager uses the staff reduction methodology.  (Id.).  In the resource action that affected plaintiff, a "work elimination" methodology was used and early professional hires, therefore, were *not* exempt from consideration.  (Id.).  It further states that the request is overbroad because there are thousands of potential custodians "as phrased," "there may be any number of emails that exist," such as an email from someone in HR or an IBM manager explaining to another manager why the staff reduction methodology excludes early professional hires. (Id.).  Additionally, IBM asserts that it "has produced documents in the relevant discovery reflecting individuals in the management chain discussing their understanding of why Early Professional Hires are excluded." (JS at 31 (citing Takahashi Decl. ¶ 13)). Plaintiff responds that IBM's statement that plaintiff was selected for layoff based on the work elimination

methodology "is false." (Pl.'s Supp'l Mem. at 2). It states that "[i]f that were true, [plaintiff's] managers would have been directed to prepare a 'Work Elimination' worksheet," but were instead "directed to make decisions based on *performance* and to follow the Staff Reduction Methodology." (Id.). He states that his "name appears on a Staff Reduction Worksheet which directs preferential treatment of IBM's Early Professional Hires." (Id.). He concludes, therefore, that if IBM "has internal memoranda or other documents discussing the reasons for excluding 'Early Professional Hires' from Staff Reductions," it should be required to produce that information as it is evidence of preferential treatment of younger workers. (Pl.'s Supp'l Mem. at 2-3).

The Court agrees that if (a) early professional hires are not excluded from consideration for layoff when the work elimination methodology is used, *and* (b) the Solitaire resource action utilized a work elimination methodology to select candidates, including plaintiff, for layoff (see JS at 30), then the documents sought by this request would not be relevant to any party's claims or defenses. However, there is no declaration signed under penalty of perjury attesting that this was in fact the case. Accordingly, **no later than October 1, 2018**, defendant shall provide a declaration, signed under penalty of perjury by a corporate officer or director, attesting to the following: (a) "early professional hires are excluded from consideration for layoff when a manager uses the staff reduction methodology"; (b) "when an employee is selected for a Resource Action using a 'work elimination' or 'job elimination' methodology, Early Professional Hires are not exempt from consideration," and (c) the Solitaire resource action utilized -- *and* plaintiff was selected for layoff based on -- "the 'work elimination' methodology." (See id.). If such a declaration is not provided, then **no later than October 1, 2018**, defendant shall produce responsive documents relating to the reasons "for excluding Early Professional hires (employees who have been hired [from] the university campus within nine months from the identification period . . .) and/or Summit Hires" from the Solitaire resource action. Given the extremely broad nature of the request, production of documents outside of the Solitaire resource action would not be proportional to the needs of the case. Based on the foregoing, plaintiff's Motion is **granted in part** as to RFP number 116.

**III.**

**CONCLUSION**

Accordingly, plaintiff's Motion is **granted in part** and **denied in part**, as set forth above. **No later than October 1, 2018**, defendant shall provide further responses, documents,  and/or declarations as set forth in this Order.

To the extent that defendant has withheld (or withholds) any document responsive to the foregoing requests pursuant to any privilege or other protection, then **no later than October 1, 2018**, it must **provide plaintiff with a sufficiently detailed privilege log to enable him to evaluate the applicability of the privilege or other protection**. Fed. R. Civ. P. 26(b)(5); Clarke v. Am. Comm. Nat'l Bank, 974 F.2d 127, 129 (9th Cir. 1992); see The Rutter Group, Cal. Practice Guide, Fed. Civ. Proc. Before Trial, Form 11:A (Privilege Log).  Failure to provide sufficient information may constitute a waiver of the privilege.  See Eureka Fin. Corp. v. Hartford Acc. & Indem. Co., 136 F.R.D. 179, 182-83 (E.D. Cal. 1991).

**It is so ordered**.

DATED:  September 17, 2018

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE